Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/24/2026 08:10 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
RAYMOND EVANS, APPELLANT.
___ N.W.3d ___

Filed July 24, 2026.    No. S-25-209.

1. **Trial: Motions for Mistrial: Appeal and Error.** A trial court is vested
   with considerable discretion in passing on motions for mistrial, and an
   appellate court will not disturb a trial court's decision whether to grant a
   motion for mistrial unless the court has abused its discretion.
2. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal
   conviction for sufficiency of the evidence, whether the evidence is
   direct, circumstantial, or a combination thereof, the standard is the same:
   An appellate court does not resolve conflicts in the evidence, pass on
   the credibility of witnesses, or reweigh the evidence; such matters are
   for the finder of fact. The relevant question is whether, after viewing the
   evidence in the light most favorable to the prosecution, any rational trier
   of fact could have found the essential elements of the crime beyond a
   reasonable doubt.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules
   apply, the admissibility of evidence is controlled by such rules; judicial
   discretion is involved only when the rules make discretion a factor in
   determining admissibility.
4. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court
   will review for abuse of discretion a trial court's evidentiary rulings on
   the admissibility of a defendant's other crimes or bad acts under Neb.
   Rev. Stat. § 27-404(2) (Cum. Supp. 2024), or under the inextricably
   intertwined exception to § 27-404(2).
5. **Judges: Words and Phrases.** A judicial abuse of discretion exists when
   the reasons or rulings of a trial judge are clearly untenable, unfairly
   depriving a litigant of a substantial right and denying just results in mat-
   ters submitted for disposition.

6. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

7. \_\_\_\_: \_\_\_\_. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

8. **Rules of Evidence: Testimony: Juries.** Under Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 2016), testimony that usurps the jury's role in making credibility determinations is not helpful and thus is improper opinion testimony.

9. **Witnesses: Testimony.** It is improper for a witness to testify whether another person may or may not have been telling the truth in a specific instance.

10. **Trial: Police Officers and Sheriffs: Testimony: Juries.** It is especially problematic when an officer testifies at trial that the defendant is untruthful, because such testimony carries with it the imprimatur of the government that can induce improper reliance by a jury.

11. **Trial: Rules of Evidence: Police Officers and Sheriffs: Extrajudicial Statements.** Statements on veracity by law enforcement officials within a recorded pretrial interrogation played for the jury at trial are neither categorically admissible nor categorically inadmissible and are to be analyzed under the ordinary rules of evidence.

12. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during trial of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

13. **Motions for Mistrial: Juries: Appeal and Error.** Where a motion for mistrial is premised on adducing evidence that violates an order in limine, an appellate court will consider that the trial judge was in the best position to assess the potential impact of such evidence on the jury.

14. **Motions for Mistrial: Proof: Appeal and Error.** To prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely showing a possibility of prejudice.

15. **Motions for Mistrial: Judges: Appeal and Error.** An appellate court reviews rulings on motions for mistrial for an abuse of discretion, and the deferential standard stems in part from the recognition that the trial judge is often better situated than a reviewing court to assess the atmosphere of the trial and the impact of certain evidence or events.

16. **Appeal and Error.** To be considered by an appellate court, the party asserting an alleged error must both specifically assign and specifically argue the error in the party's initial brief.

17. **Rules of Evidence: Other Acts: Words and Phrases.** Though difficult to define, character, for purposes of § 27-404(2) (Cum. Supp. 2024), has been described as the generalized disposition or tendency to act in a particular way in all the varying situations of life, caused by something internal to the actor that arises from that person's moral being.

18. **Rules of Evidence: Other Acts.** Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

19. **Witnesses: Testimony: Appeal and Error.** A continuing objection to a witness' testimony does not preserve the alleged error for testimony by that witness before the objection was made.

20. **Trial: Testimony: Appeal and Error.** Though whether an error is harmless must be a fact-specific inquiry in light of the totality of the record, the admission of testimony objected to is ordinarily not prejudicial error when such testimony is substantially identical to testimony admitted without objection.

21. **Criminal Law: Evidence: Other Acts.** Other acts are acts not part of the events giving rise to the present charges, whereas acts that are inextricably intertwined with the present charges form part of the factual setting of the crime, are so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or are necessary for the prosecution to present a coherent picture of the charged crime.

22. **Rules of Evidence: Other Acts.** The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of other conduct that forms an integral part of the crime charged is not rendered inadmissible under Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024) merely because the acts are criminal but have not been charged.

23. **Evidence: Other Acts.** The relevancy of intrinsically intertwined conduct does not rely on propensity reasoning.

24. **Evidence: Other Acts: Intent.** Evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent.

25. **Verdicts: Appeal and Error.** The inquiry in a harmless error analysis is whether the actual guilty verdict rendered was surely unattributable to the error.

26. **Criminal Law: Legislature: Weapons.** The Legislature's purpose in creating a separate offense of using a weapon in the commission of a felony was to discourage individuals from carrying deadly weapons

while they commit felonies in order to prevent the threat of violence and accompanying danger to human life present whenever one has a deadly weapon within one's immediate control during the commission of a felony.

27. **Criminal Law: Statutes: Weapons: Intent.** The statutorily enumerated weapons are considered deadly weapons per se, when they satisfy the definitions for those items, whereas whether any "other device, instrument, material, or substance," as stated in Neb. Rev. Stat. § 28-109(8) (Reissue 2016), constitutes a deadly weapon depends on the manner in which it was used or intended to be used.

28. **Weapons.** A trier of fact can infer from the nature of the victim's injuries that a deadly weapon was used, without determining the precise identity of the device, instrument, material, or substance.

29. **Evidence: Appeal and Error.** An appellate court's standard of review directs the appellate court to evaluate the evidence that was actually before the fact finder, rather than ponder potentially incriminating facts that were lacking.

30. **Convictions: Weapons: Intent: Circumstantial Evidence.** So long as there is sufficient circumstantial evidence that any device, instrument, material, or substance was used to commit a felony, and that such device, instrument, material, or substance was capable of producing death or serious bodily injury in the manner it was used or intended to be used, then there is sufficient evidence to support a conviction for use of a deadly weapon to commit a felony.

31. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

32. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

33. ____: ____. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

34. **Proof: Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

35. **Effectiveness of Counsel: Appeal and Error.** In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding,

an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.

36. ____: ____. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record and, thus, an evidentiary hearing.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Kenneth Jacobs, of Hug and Jacobs, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Freudenberg, J.

## I. INTRODUCTION

Raymond Evans was convicted by a jury of first degree murder and use of a deadly weapon (not a firearm) to commit a felony. Evans, represented by new counsel on appeal, asserts that (1) the district court erred in denying his motion for mistrial, (2) the State's evidence was not sufficient to sustain a conviction for use of a deadly weapon (not a firearm) to commit a felony, (3) the district court abused its discretion in allowing the State to present other bad acts evidence, and (4) his trial counsel was ineffective for failing to properly investigate and cross-examine the victim's ex-husband. We affirm.

## II. BACKGROUND

Evans' charges arose after he allegedly bludgeoned to death his then-girlfriend at her apartment in Omaha, Nebraska, and dumped her body in a field outside of Lincoln, Nebraska. At the conclusion of an 11-day jury trial, Evans was found guilty of both first degree murder and use of a deadly weapon (not a firearm) to commit a felony. Evans was sentenced to life imprisonment pursuant to the first degree murder conviction and 40 to 50 years' imprisonment pursuant to the use of a

deadly weapon (not a firearm) to commit a felony conviction. The sentences were ordered to be served consecutively.

## 1. Evidence Presented at Trial

The basic facts adduced at trial showed that Cecilia Perez met Evans through a "dating app" in the fall of 2022. She was killed approximately 1 year later, in November 2023.

Evans was "a dog walker and an MMA fighter" who was living in Lincoln when he met Cecilia. Cecilia lived in Omaha and worked as a nurse at a local nursing home, primarily working shifts on the weekends.

Cecilia had three children from two previous relationships. Two of her children were born from her relationship with Antonio Ramirez. That relationship ended approximately 10 years before the events in this case. The other child was born from her relationship with Adam Jones, whom Cecilia married in Jamaica in 2015, but never filed paperwork in the United States to be legally married. Jones and Cecilia split up in the summer of 2022, when she moved to an apartment at Woodcrest Plaza (Woodcrest apartment) in Omaha.

When Cecilia and Evans met, her oldest child, N.R.P., was living with her and the younger two children split time between Cecilia's and Jones' homes. At that time, Cecilia was driving a vehicle owned by Jones.

Evans moved into Cecilia's Woodcrest apartment in May 2023, after they had been dating for several months. Cecilia struggled with an alcohol abuse disorder, and, in March 2023, Child Protective Services became involved with Cecilia's children due in part to Cecilia's drinking. As a result of the involvement of Child Protective Services, Cecilia's two youngest children were not allowed to live with Cecilia at the Woodcrest apartment and Cecilia had to have supervised visits outside of the Woodcrest apartment. N.R.P. moved out of the apartment after Evans moved in, due to her constant arguments and confrontations with Evans. N.R.P. went to live with a friend's mother, Kathryn Diaz.

N.R.P. testified that Evans did not have his own vehicle and used Cecilia's vehicle every day. Jones testified that when he learned Evans was the primary user of the vehicle he owned and was allowing Cecilia to drive, he took it back. In October 2023, Cecilia purchased a red 2013 GMC Acadia from Automart 150 in Council Bluffs, Iowa. After her murder, the vehicle still had paper dealer plates showing it had been purchased from Automart 150.

Cecilia was last seen by someone other than Evans on Friday, November 17, 2023. That evening, Cecilia had a scheduled supervised visit with her youngest child. Cecilia arrived at the supervised visit at 6 p.m. Marquetta McGee, Cecilia's supervised visitation specialist, described Cecilia's demeanor as quiet and "off." Cecilia's mannerisms concerned McGee, who suspected Cecilia may have been under the influence of alcohol. When Cecilia admitted to being under the influence of alcohol, McGee ended the visit. McGee suggested that Cecilia "get a ride" and asked that Cecilia text her when she got home safely. McGee reported that Cecilia was crying after this conversation and that Cecilia texted her twice that night, with the second time being around 11 p.m. According to McGee, the second text asked what time the visit ended, which McGee found to be "weird" and "confusing."

Cecilia was scheduled to work on both Saturday, November 18, 2023, and Sunday, November 19, but did not show up for work either day. Cecilia called on Saturday morning to say she was not going to be at work. Barbara Renken answered the call. Renken testified that Cecilia sounded like "she had been crying for some time, or had a really bad head cold." This was the last time anyone other than Evans reported seeing or hearing from Cecilia.

On Sunday morning, Regina Yokwe, a charge nurse, answered a call that was reportedly from Cecilia, who said she would not be going to work that day. According to Yokwe, however, the caller had a "male voice." Yokwe testified she

confronted the caller about sounding like a man, and the caller immediately hung up.

### (a) Initial Missing Persons Investigation

In the early evening of Tuesday, November 21, 2023, Emma Wineinger, Cecilia's younger sister, called the 911 emergency dispatch service to report that Cecilia was missing. After police officers Brandon Fender and Christopher Overton met with Wineinger and Brandy Perez, another of Cecilia's sisters, the officers made their way to Cecilia's Woodcrest apartment. Officers were on the lookout for Cecilia's Acadia. When the officers arrived at the apartment, they noted that the Acadia was not in the parking lot.

The officers entered the apartment building and knocked on the door of Cecilia's apartment but there was no answer. Overton began checking with neighbors inside the apartment building and spoke with a neighbor who lived immediately above Cecilia's apartment, who said he had concerns about a dog in Cecilia's apartment barking a few days before.

Fender and Overton were continuing their investigation, when Evans entered the apartment building, approached the officers, and said he needed to talk with them. Evans invited Fender into the apartment to talk while Overton remained in the hall.

Fender described Evans as "very forthcoming" during this initial interaction, noting that he did not have to ask followup questions before Evans continued providing information. Evans told Fender that Cecilia had planned to meet up with her friend, Monica Durand, the prior weekend and that he had not seen or heard from Cecilia since. Before the officers left the apartment, Fender called Durand, who informed Fender that she had not seen Cecilia in the recent past, was unaware of her whereabouts, and had no plans to meet up with her during the prior weekend.

When Fender and Overton left the Woodcrest apartment, they noticed that Cecilia's Acadia was parked outside.

### (b) November 21, 2023, Initial Search
### of Woodcrest Apartment

Later that same night, Fender and Overton returned to the Woodcrest apartment with their supervisor, Sgt. David Preston, Jr., to do a check of the apartment to see if Cecilia was inside. Preston talked with Evans in the living room of the apartment while Fender and Overton searched the apartment in areas large enough for a person to fit in, which Preston described as "standard protocol for missing persons reports." Overton observed blood on the wall and on a television in the master bedroom. Fender observed blood spatter on the wall in the closet. Fender also noticed the carpet in the master bedroom had differing colors "from a darker brown to almost a white color," which he attributed to cleaning. Fender noted there was no bedding or sheets on the bed in the master bedroom, but Preston testified there were two pillows with pillowcases.

Preston described Evans as cooperative during their conversation in the living room but that he gave information that did not "seem like [it] fit the situation." Evans voluntarily described where he was when asked about the last time he saw Cecilia. Evans was also "pushing" his phone on Preston, showing him text messages between him and Cecilia, rather than providing information about Cecilia and places she may be or often "hang[s] out."

Before leaving, the officers did a brief check of the Acadia, which Evans unlocked for them. The officers did not find anything of note, but Fender observed that the vehicle was very clean inside.

### (c) Cecilia's Body Found and Autopsy

Cecilia's body was found near the intersection of 98th Street and Havelock Avenue on the outskirts of Lincoln on the afternoon of Tuesday, November 21, 2023. Officers observed that the body was wrapped in several items, including a "mermaid comforter" and a black plastic trash bag. Law enforcement surmised that the body had been dumped in the location

very recently, because it lacked apparent decomposition and was dry even though it had rained in that area up until Monday night. Law enforcement also noted the presence of tire tracks pulled over toward the side of the gravel road adjacent to where the body had been found. Later testing and analysis showed that Cecilia's Acadia was a possible source of the tire tracks.

Dr. Erin Linde, a forensic pathologist, performed the autopsy on Cecilia's body. She first observed that the outer layer of materials wrapped around the body consisted of a mermaid comforter and black plastic trash bag, with clear tape wrapped around. Underneath the outer layer, Linde observed a black fabric material, which Linde described as a "satin-like microfiber sheet." Under the black sheet, Cecilia was clothed in sweatpants and a T-shirt.

Linde performed a series of x rays and a full external examination of Cecilia's body in order to determine the cause of her death, which was found to be extensive blunt force injuries. X rays showed that Cecilia had a fracture in her left forearm but no other visible fractures or foreign objects or projectiles inside her body. Upon further internal inspection, Linde discovered fractures to Cecilia's spine and ribs. During the external examination, Linde noted extensive bruising on Cecilia's head, arms, and legs, as well as some bruising on her torso and back. Linde also observed that Cecilia's nose was broken and that she had various abrasions and lacerations in many places on her body, including her head, face, arms, and legs.

Linde noted that many of the bruises and abrasions on Cecilia's body were curved or circular in shape, which she found suggestive of a "round-type object" being used to strike the skin repeatedly. Additionally, there were several paired, clawlike injuries on Cecilia's body, including on her thigh just below her hip. Photographs of Cecilia's body entered into evidence at trial showed the curve-shaped bruises and abrasions, as well as the paired, clawlike injuries.

When asked about the nature of Cecilia's wounds and what may have caused them, Linde explained that "the paired injuries, the rectangular shape, the round patterned contusions and abrasions . . . we're seeing would suggest more of a hammer-type object, including . . . a claw-type hammer, which has those paired tong or prongs at the back." Linde opined that the injuries on Cecilia's hands, forearms, and legs appeared to be defensive, where she appeared to be attempting to keep an "object" from striking her, whether it was a knife or "some other object."

Overall, Linde testified that Cecilia's blunt force injuries were unlike anything she had seen in the 3,100 autopsies she had performed; the injuries to Cecilia's tissue were similar to a pedestrian being hit by a vehicle. Linde described the tissue under Cecilia's arms and legs as "fluid-like," indicating sufficient, repetitive blunt force trauma to break down the tissue. Linde opined there was likely repetitive force that caused the nature of Cecilia's injuries and ultimately her death.

### (d) Sgt. David Hinsley's Interview With Evans

On Wednesday, November 22, 2023, the day after Cecilia's body was found and the same day as the autopsy, Evans, not knowing a body had been found, went to a cellular service provider's retail location at the suggestion of Cecilia's aunt, Dawn Van Sloun, to access Cecilia's phone records and potentially find information concerning her whereabouts. When Evans was unable to get that information, he called the missing persons report line and spoke with a sergeant, who, at the request of the detectives investigating the murder, asked Evans if he would be interested in reporting to the Omaha Police Department's headquarters for an interview. Evans agreed to do so.

Evans arrived at police headquarters in downtown Omaha in Cecilia's Acadia. Hinsley, before commencing the interview, assigned a detective to go to Automart 150 to get physical access to the "GPS" records for the Acadia, and Hinsley

learned that the Acadia's GPS records showed the vehicle had been in Lincoln at 4:17 a.m. the day before, Tuesday, November 21, 2023, near the intersection of 98th Street and Havelock Avenue, where Cecilia's body was found. With this information in mind, Hinsley began interviewing Evans.

A video recording of the interview was played for the jury, with certain statements redacted. The redacted video was almost 4½ hours long. In the redacted video played for the jury, Hinsley began the interview by having an informal conversation with Evans wherein Evans was very forthcoming with information from his phone, including texts from Cecilia's phone, and with information about his going to his grandmother's house over the weekend and Cecilia's wanting to meet up with Durand on Sunday. Evans waived his rights and then walked Hinsley through his version of the events of the previous weekend, using his phone to show texts and phone calls with Cecilia and her friends and family. Evans told Hinsley that he and Cecilia were at the apartment essentially all weekend, except for when Evans went to his grandmother's house in northeast Omaha on Sunday afternoon. Evans described the weekend as normal and denied that there were any arguments between him and Cecilia, even when Hinsley told Evans a neighbor had reported hearing an argument on the prior Sunday. Evans explained he and Cecilia had a conversation about him getting a job but adamantly denied having an argument or fight.

Evans talked at length about his poor relationship with Cecilia's family and friends, including her daughter N.R.P. Evans also discussed Jones a great deal, detailing how Jones' relationship with Cecilia ended, how Jones allegedly told Evans that Cecilia was probably cheating on him and had been kidnapped, and how the last known location of Cecilia's phone was near Jones' house and workplace. Evans explained that Cecilia would sometimes meet up with other men for money, which was acceptable to him if she was honest about it.

Evans confirmed that no one else besides him or Cecilia had been driving the Acadia and that, since Cecilia had been missing, he was the only one who had the vehicle. Evans explained there was only one set of keys to the Acadia, which he possessed. This was corroborated by the detective who went to Automart 150 and learned that Cecilia was given one set of keys, while the dealership retained the other until the vehicle was paid off.

Evans told Hinsley the last time he was in Lincoln was the previous Thursday. When Hinsley asked Evans to tell him about his trip to Lincoln the day prior, Tuesday, November 21, 2023, Evans denied making any such trip. At that point, Hinsley informed Evans of the GPS on the Acadia and how it "pinged" near 98th Street and Havelock Avenue at 4:17 a.m. on the previous day. Evans denied being at that area at that time and said he was at home. Evans said his phone would show his location was at the apartment at 4:17 a.m. He could not explain the Acadia GPS information.

During the interview, a search warrant had been obtained and a search of the Woodcrest apartment was conducted. Hinsley informed Evans of the search and that castoff, high-velocity blood spatter, was observed at the apartment. Evans said nothing had happened at the apartment and asked where his DNA was in relation to the blood. When Hinsley asked about a ring found on the sink of the master bathroom during the search, Evans said there was no blood on the ring. Hinsley informed Evans there was blood observed on the ring, to which Evans explained that his fingers were not swollen and that they would have been had he punched Cecilia while wearing the ring.

Hinsley told Evans that Cecilia's body had been located and showed Evans a photograph of Cecilia's body as it was found in the field outside of Lincoln. Evans did not react to the photograph and continued to deny that he had gone to Lincoln the day before. Evans also continued to deny that he hit Cecilia while wearing the ring or anything else.

Evans again emphasized that the location information from his phone would not match up with where Cecilia's body was found.

When Hinsley returned to the interview after a short break, Evans was visibly emotional and made statements such as, "[t]here is no future," "I don't have a life after here," "[i]t's over with," and "[m]y life is over." Evans also said he needed a few days to think about things before he could say what happened. Hinsley ended the interview after Evans asked for an attorney.

The redactions from the video had been made pursuant to Evans' oral motion to redact portions where marijuana use, past domestic violence allegations, 911 calls alleging Evans beat dogs, and DNA evidence were discussed. Evans also sought to redact statements made by Hinsley about Evans' being untruthful or being guilty. The court agreed to redact references to past domestic violence allegations, beating dogs, and Evans' truthfulness. The court stated it would give a limiting instruction covering those acts not redacted, such as the marijuana use. Before any part of the video of the Hinsley-Evans interview was played for the jury, the court instructed the jury as follows:

> Ladies and gentlemen, we're about to hear and see a recording of the interview with Raymond Evans and Sergeant Hinsley. I've ordered parts of the recording to be deleted for efficiency purposes and because the deleted portions are not relevant for purposes of this trial.
>
> You're not to concern yourself with the contents of the deleted portions, or consider them at all in your deliberations, or speculate as to their content. In addition, you may hear evidence of bad acts about Raymond Evans other than the charge for which he is on trial. You should not consider those acts, including possessing or smoking marijuana for purposes of Raymond Evans['] character. Raymond Evans is on trial only for the charges that I've instructed you in the beginning of the case.

A couple of hours into the playing of the interview at trial, Evans' attorney requested a sidebar to discuss a statement that was supposed to have been stricken from the video but was played for the jury. Specifically, Hinsley's statement "you're not being truthful, though," was played to the jury. Hinsley's statement came after Evans said he was being cooperative, and Hinsley told Evans there was a difference between being cooperative and being truthful. Evans moved for a mistrial on the grounds that the stricken statement was played for the jury. The court denied the motion for mistrial but stated it would formulate a limiting instruction to address the error.

The court allowed the State to resume the video for about another hour before the court adjourned for the day. No limiting instruction was given at the conclusion of the portion of the video played that day. However, the next morning before trial resumed, the court granted Evans' request that a limiting instruction be given before and after the playing of the remainder of the video that the jury had not yet heard. Before the redacted interview video was resumed, the court gave the new limiting instruction to the jury, which provided:

> And, ladies and gentlemen, before we resume playing of the interview, I would like to read an instruction to you. Members of the jury, you are about to hear and have been listening to a video where Detective Ryan Hinsley questioned Raymond Evans. This is admitted for Raymond Evans['] statements. Detective Hinsley's statements are included to give context to Raymond Evans['] statements. Detective Hinsley's statements were part of interview techniques and should not be considered as substantive evidence in any way in determining if Raymond Evans committed first degree murder or use of a weapon, not a firearm, to commit the same. Raymond Evans['] statements are evidence in this case.

Following the conclusion of the video and the end of Hinsley's testimony that day, the court again read the above limiting instruction to the jury.

After the State rested its case in chief, Evans again moved for mistrial on the grounds of Hinsley's statement about Evans' being untruthful. The State countered that Hinsley's comment was unintentionally played, all other similar statements were redacted, and the single comment did not rise to the level of a mistrial. The court again denied Evans' motion for mistrial, explaining it believed the comment was inadvertently not redacted and the limiting instruction was sufficient to resolve the issue.

Several instructions in the court's instructions at the close of all the evidence addressed the video of Hinsley's interview with Evans and any prior bad acts or commentary on truthfulness. Instruction No. 13 provided:

> You may have heard evidence of bad acts about Raymond Evans other than the charges for which he is on trial. You should not consider those acts (including possession and/or smoking marijuana) for purposes of Raymond Evans' character. Raymond Evans is on trial for only the charges that I have instructed you in the beginning of the case.

Instruction No. 14 continued:

> You heard and saw a recording of an interview with Raymond Evans and Sgt. Hinsley. I have ordered parts of the recording to be deleted for efficiency purposes and because the deleted portions are not relevant for purposes of this trial. You are not to concern yourself with the contents of the deleted portions, consider them at all in your deliberations, or speculate as to their content.

Finally, instruction No. 15 provided:

> You heard and saw a video where Detective Ryan Hinsley questioned Raymond Evans. This is admitted for Raymond Evans' statements. Detective Hinsley's statements are included to give context to Raymond Evans' statements. Detective Hinsley's statements were part of interview techniques and should not be considered as substantive evidence in any way in determining if

Raymond Evans committed first degree murder or use of a weapon, not a firearm, to commit the same. Raymond Evans' statements are evidence in this case.

During closing argument, counsel for the State said to the jury, "There's a difference between being cooperative and being truthful. And I — I'm positive you know the difference." Evans did not object to this statement during closing argument.

### (e) November 22, 2023, Woodcrest Apartment Search and Followup Investigation

In the search conducted during the Evans-Hinsley interview, detectives found black satin and mermaid pillowcases matching the black satin sheet and mermaid comforter Cecilia's body was found wrapped in. In the kitchen of Cecilia's Woodcrest apartment, detectives observed a black plastic trash bag with a blue tie, which matched the trash bags found wrapped around Cecilia's feet and head. While looking for a hammer, based on Linde's opinion from the autopsy, detectives found a toolbox containing common household tools, including a socket wrench set, a measuring tape, a level, screwdrivers, Allen wrenches, and adjustable wrenches, but no hammer. Detectives did not locate a hammer in the apartment and did not find any other tools in the apartment. Detectives found evidence of blood and cleaning throughout the apartment. Blood was found on the walls and television in the master bedroom, on a gold ring found in the master bathroom, on the carpet in the master bedroom, in a wet rug and underlying flooring in a secondary bedroom, and on a pair of men's compression shorts.

A forensic DNA analyst testified that Cecilia and Evans were included as contributors to a mixture of DNA found on clear plastic tape taken from the comforter wrapped around Cecilia's body. She testified that the blood swabbed from various places in the apartment was determined to be Cecilia's. This included blood found on Evans' gold ring, on the wall in the master bedroom, on the closet doorframe in the master

bedroom, on the television in the master bedroom, and on the cement under the carpet in the secondary bedroom.

Detectives searched the Acadia and observed it was very dusty and dirty on the outside, particularly in the tailgate area, which was consistent with the Acadia's being driven on the gravel roads near 98th Street and Havelock Avenue in Lincoln a few days before. Detectives also noted that there were areas on the outside of the Acadia where it looked like something was leaned up against it and that someone appeared to have attempted to wipe down the vehicle very quickly. Inside the Acadia, detectives found several personal items, some apparently belonging to Cecilia, including various articles of clothing, a wallet, a debit card, and keys to the Woodcrest apartment. Detectives looked for blood or fluids inside the Acadia but found nothing of significance.

A digital forensics expert analyzed location information from Evans' and Cecilia's phones and tied that with GPS data for Cecilia's Acadia obtained with the assistance of Automart 150. The digital forensics expert explained that on Sunday, November 19, 2023, which was the last day Evans claimed he had seen Cecilia before she supposedly met up with Durand but the day after anyone besides Evans reported having seen or heard from her, Cecilia's and Evans' phones were both at the Woodcrest apartment until about 2 p.m., when Evans left the apartment. Shortly before Evans left, the two phones exchanged messages about Evans going to his grandmother's house and Cecilia's going to meet up with Durand later. Just after 2 p.m., Evans' phone traveled from the Woodcrest apartment to the area of 33d Street and Fowler Avenue in northeast Omaha, where Evans had told Hinsley that his grandmother's house is located. GPS data from the Acadia shows the same path of travel from the Woodcrest apartment to the area of 33d Street and Fowler Avenue.

Evans' phone remained at the area of 33d Street and Fowler Avenue until approximately 8:43 p.m., except for a brief trip to and from nearby 50th Street and Ames Avenue around

5 p.m. Although Evans' phone remained in northeast Omaha, GPS data from the Acadia showed that the Acadia traveled from northeast Omaha to the Woodcrest apartment and back between 6:26 and 8:26 p.m.

Between 6:24 and 7:32 p.m., data from Evans' phone shows that the phone was locked and "no apps" were used, which coincides with the time when the Acadia left the area of 33d Street and Fowler Avenue. During the interview with Hinsley, Evans said he was at his grandmother's house all afternoon on November 19, 2023, until he returned to the Woodcrest apartment later that night.

Cecilia's phone sent text messages to Evans' phone at 6:49 and 7:15 p.m. on Sunday, November 19, 2023. The first text read, "I'm heading to [Durand's] now," and the second read, "I just made it to [Durand's,] I love you." Data from Cecilia's phone indicates that it remained at the Woodcrest apartment from 9:54 p.m. on Friday, November 17, until 6:58 p.m. on Sunday, November 19.

Corresponding to the Acadia's GPS data at the same time, Cecilia's phone data shows it traveled from the Woodcrest apartment at 6:58 p.m. until 7:15 p.m., ending near the "Aksarben" area where the "I just made it to [Durand's,] I love you," text was sent. At that point, Cecilia's phone was either shut off or destroyed because it stopped communicating with the cell towers.

The Acadia then returned to the area of 33d Street and Fowler Avenue. Data from Evans' phone showed that Cecilia's text messages were not read until 8:04 p.m. At 8:43 p.m., Evans' phone and the Acadia returned from the area of 33d Street and Fowler Avenue to the Woodcrest apartment.

Detectives utilized surveillance footage to corroborate the accuracy of the Acadia's GPS data. On Monday, November 20, 2023, at 5:55 p.m., the Acadia "pinged" near 72d Street and Ames Avenue. Surveillance footage from stores at that area showed a red Acadia with paper dealer plates and a driver wearing a "red top" arriving at the parking lot at that

location shortly after 5 p.m. The Acadia remained parked for about 3½ hours before leaving at 8:31 p.m.

Early the next day, on Tuesday, November 21, 2023, at 3:33 a.m., surveillance footage from near the Woodcrest apartment showed a figure, who appeared to be carrying a large item, exiting the door to Cecilia's apartment building. A short time later, headlights illuminated the apartment building, and the vehicle left the parking lot. The vehicle left the apartment complex and headed in the direction of the nearby interstate.

An internet search showed that it is a 39-minute drive to travel from the Woodcrest apartment to 98th Street and Havelock Avenue, just outside of Lincoln, which corresponded with leaving the apartment at 3:33 a.m. and being at 98th Street and Havelock Avenue at 4:17 a.m. At 4:17 a.m., the key GPS data point for the Acadia's location was near the intersection of 98th Street and Havelock Avenue, which is adjacent to the field where Cecilia's body was found later that same day.

The digital forensics expert testified that cellular data from 3:26 to 4:16 a.m. on Tuesday, November 21, 2023, showed the Acadia connected with six different cell towers, starting near the Woodcrest apartment and following along Interstate 80 toward Lincoln, with the last cell tower connected to being in northeast Lincoln near where Cecilia's body was found. GPS data showed that between 4:17 and 5:17 a.m., the Acadia traveled back from Lincoln to southwest Omaha along the same path in reverse, ending back at the Woodcrest apartment.

### 2. State's Evidence of Evans' Relationship With Cecilia, Evans' Concerns for Her Safety, and Evans' Other Bad Acts

At trial, the court allowed the State to admit statements by Cecilia's family members and coworkers about her relationship with Evans and safety concerns they had for Cecilia. The court overruled objections by Evans to such testimony on the grounds of relevance, undue prejudice, and prior bad

acts. Evans first objected, during opening statements, to the State's characterization of Evans' control over Cecilia. The court overruled the objection and stated, "You can have a continuing objection," but it did not specify the limits of that continuing objection. Throughout trial, Evans objected during most witnesses' testimony on these topics, albeit not all. Evans objected on the grounds of relevance and Neb. Rev. Stat. §§ 27-403 and 27-404 (Cum. Supp. 2024), to such testimony from Tyrone Charleston, Tyara Morris, Donna Balkus, Durand, Brandy, Wineinger, Jones, Diaz, and N.R.P. Only one objection on these grounds was sustained by the court, while the remainder of Evans' objections were overruled. In each case, the court stated that Evans could have "a continuing objection" to the witness' testimony, but it did not state that the continuing objections would apply across witnesses.

Charleston, a Department of Health and Human Services caseworker, testified that he became involved with Cecilia's family because of safety concerns about Cecilia's drinking and Evans' living in the apartment with Cecilia. Morris, Cecilia's coworker, testified that she spoke with Cecilia about her relationship with Evans and that those conversations caused her concern for Cecilia's safety. Morris further testified that Evans dropped Cecilia off for work and would be waiting for her in the parking lot during her breaks and at the end of her shifts. Balkus, another of Cecilia's coworkers, broadly testified that she had concerns for Cecilia's safety due to her relationship with Evans. Durand, a close friend who often "h[u]ng out" with Cecilia, testified that she had concerns for Cecilia's safety after she did not answer the door at her apartment when Durand and Cecilia had made plans to watch a movie in September 2023.

Brandy, one of Cecilia's sisters, testified that, based on her conversations with Wineinger and N.R.P. between Christmas 2022 and the spring of 2023, Brandy had concerns for Cecilia's safety because of her relationship with Evans. Brandy also explained that Child Protective Services had a rule that Evans

could not be present when Cecilia saw her children. Brandy testified about a confrontation she had with Evans sometime in the summer of 2023 when she came to the Woodcrest apartment to pick Cecilia up for a visit with her children. Brandy arrived early to pick Cecilia up, which led to an argument with Evans while Cecilia was in the back bedroom of the apartment, and Brandy testified that Evans treated her like he was "intimidated" by her and did not want her there.

Wineinger, another sister of Cecilia's, testified about some of her experiences with Evans and how Evans treated Cecilia when Wineinger was living at the Woodcrest apartment around April 2023. Wineinger described her first interaction with Evans as "weird," explaining that Evans drove chaotically while driving her to work with Cecilia in the vehicle. Further, when Evans would drive Wineinger to and from work without Cecilia in the vehicle, Evans would drive very cautiously, which would cause Wineinger to be late to work. Wineinger described Evans as being possessive of Cecilia, by keeping her in her bedroom and often blocking the door to the bedroom so no one could get in, as well consistently referring to Cecilia as "woman" or "my woman." Wineinger also testified that Evans would buy Cecilia alcohol, despite Cecilia's struggling with sobriety. Wineinger testified that Evans would stare her down and eat her food and that she had once woken up to him staring at her, all of which she said made her feel threatened. Wineinger explained that while she was concerned for her own safety at first, she became concerned for Cecilia's safety based on how Evans was treating her. Wineinger testified that Evans changed the locks to the apartment around June or July 2023, and she was not able to retrieve her things from the apartment until after Cecilia died. Wineinger said she remained in contact with Cecilia over text and would see her at visitations at Brandy's. Wineinger described Cecilia during July and August 2023 as "really sad."

N.R.P. testified at length about her relationship with her mother, the impact Evans had on that relationship, and

her interactions with Evans. N.R.P. was asked if she "saw something on" her mother that caused her to confront Evans, which drew an objection "as to relevance, 403, 404, not inextricably intertwined." During a sidebar, the court explained that N.R.P. could explain that she confronted Evans about her mother's having a black eye but could not testify that she thought Evans did it. N.R.P. explained that she confronted Evans sometime after Christmas 2022 about what she had seen, to which Evans explained to N.R.P. that he and Cecilia were "play fighting." N.R.P. also testified about her interactions with Cecilia in November 2023, where N.R.P. described Cecilia as being "extremely upset," mostly due to the fact that N.R.P. was not moving back into the apartment because Evans was still living there. N.R.P. testified that she was concerned for her mother.

Evans did not object when Van Sloun generally testified that she had concerns for Cecilia's safety as it related to her relationship with Evans. Evans also did not object to Diaz' testimony that she had safety concerns for Cecilia because of her relationship with Evans. Evans only objected later in Diaz' testimony when she was asked about her concerns with Evans' living in the apartment with Cecilia.

After the State rested its case in chief, Evans moved for a mistrial, in part on the grounds that the evidence of Evans' other bad acts were wrongfully admitted. The court denied the motion.

### 3. EVANS' DEFENSE OF OTHER POSSIBLE SUSPECTS

As part of Evans' defense, defense counsel emphasized Cecilia's past relationships with Ramirez and Jones and the police's apparent lack of investigation into the two men as potential suspects. Through counsel, Evans attempted to cross-examine Brandy about Cecilia's relationship with Ramirez. The court sustained the State's relevance objection and explained in a sidebar that it was concerned about getting into the details of a relationship that had taken place

over a decade ago. Evans also asked Det. Cortes Clark if Omaha Police Department's investigation included looking into Ramirez' background. This line of questioning again drew a relevance objection from the State, which the court sustained after another sidebar.

On cross-examination of Brandy, Evans tried to inquire into what ended the relationship between Cecilia and Jones in 2022. The court sustained the State's relevance objection to that line of questioning. During a sidebar, the court explained that it did not see the relevance of a disagreement or argument between Jones and Cecilia from 2021 or 2022. The court explained that Evans could ask police officers about investigating Jones as a suspect, but it was not relevant during Brandy's testimony.

Van Sloun testified that when she served as the personal representative of Cecilia's estate, she learned Cecilia had "taken out" a life insurance policy in August 2023 and named N.R.P. and Jones as equal beneficiaries of the policy. On cross-examination, Evans elicited that Cecilia's life insurance policy was worth $150,000.

On cross-examination of Jones, Evans inquired into Jones' relationship with Cecilia's sisters, Cecilia's alcohol problem, and his knowledge of Ramirez. Evans did not ask about the last time Jones saw Cecilia, what he was doing around the time she went missing, or Jones' being a beneficiary on Cecilia's life insurance policy.

On cross-examination of Clark, Evans asked if he had tried to reach out to Jones as part of the investigation. Clark explained that he had reached out to Jones, who told Clark that he was represented by an attorney and that Clark should speak to the attorney. Clark explained that both Ramirez and Jones were eliminated as suspects based on the evidence. Hinsley likewise testified that Ramirez and Jones were excluded as suspects based on the evidence.

Evans called as witnesses three of his family members concerning his whereabouts over the weekend of November 17, 2023: Evans' father, Evans' cousin, and Evans' aunt. All three

testified that they had seen Evans at the family residence on Fowler Avenue in Omaha at least some over that weekend. Evans' father testified that Evans was at the family residence most of the day on Sunday that weekend. Evans' cousin testified that he and Evans went to a discount department store and a fast-food restaurant and stopped to get beer, but he could not remember which day it was that weekend. Evans' aunt testified that Evans drove her to the store to get groceries for Thanksgiving, but she also could not remember when that occurred.

### 4. Evans' Motion for Directed Verdict on Use of Deadly Weapon to Commit Felony

At the conclusion of the State's case in chief, Evans moved for a directed verdict on the use of a deadly weapon (not a firearm) to commit a felony charge. Evans argued that the State never introduced an exhibit or any weapon to support a finding of guilt on that charge. The State countered that the absence of a specific weapon is not grounds alone for a directed verdict on the use charge. The State pointed to Linde's testimony about Cecilia's cause of death being blunt force trauma caused by a weapon, "whether it was one or two or more." The court denied Evans' motion for directed verdict.

When the case was submitted, the court instructed the jury on the elements of use of a deadly weapon (not a firearm) to commit a felony. The first element required the jury to find that Evans "intentionally used a deadly weapon." A deadly weapon was defined as "anything that is used or intended to be used in a way that could produce death or serious bodily injury."

After less than 1½ hours, the jury returned verdicts finding Evans guilty of first degree murder and use of a deadly weapon (not a firearm) to commit a felony. Evans was sentenced and timely appeals.

### III. ASSIGNMENTS OF ERROR

On appeal, Evans asserts the following errors, restated: (1) The district court erred in overruling his motion for mistrial

when a statement accusing him of being untruthful, which was ordered to be excluded from trial, was played during a video shown to the jury; (2) there was not sufficient evidence to support a conviction of Evans for use of a deadly weapon (not a firearm) to commit a felony; (3) the district court abused its discretion in allowing the State to present other bad acts evidence over the objection of trial counsel, after the district court ruled it was inextricably intertwined; and (4) Evans received ineffective assistance of trial counsel when counsel failed to adequately investigate the victim's ex-husband as a potential suspect and failed to adequately cross-examine the ex-husband at trial.

## IV. STANDARD OF REVIEW

[1] A trial court is vested with considerable discretion in passing on motions for mistrial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.[1]

[2] In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[2] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

[3-5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4] An appellate

---

[1] See *State v. Price*, 320 Neb. 1, 26 N.W.3d 70 (2025).

[2] *State v. Haynie*, 317 Neb. 371, 9 N.W.3d 915 (2024).

[3] *Id*.

[4] *State v. Allen*, 318 Neb. 627, 17 N.W.3d 794 (2025).

court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under § 27-404(2), or under the inextricably intertwined exception to § 27-404(2).[5] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[6]

[6,7] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[7] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[8]

## V. ANALYSIS

### 1. MOTION FOR MISTRIAL REGARDING OFFICER'S INTERVIEW STATEMENT THAT EVANS WAS UNTRUTHFUL

Evans' principal argument on appeal is that the court abused its discretion in denying his motion for a mistrial after the jury heard, in the video recorded police interview, an officer say to Evans, "[Y]ou're not being truthful." He argues the court's limiting instructions were insufficient to remove the damaging effect of the officer's imprimatur of the government that may have led the jury to improperly rely on the officer's opinion of Evans' credibility.

[8-10] Under Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 2016), testimony that usurps the jury's role in making

---

[5] *State v. Logan*, 320 Neb. 554, 28 N.W.3d 510 (2025).

[6] *State v. Allen, supra* note 4.

[7] *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025).

[8] *Id*.

credibility determinations is not helpful and thus is improper opinion testimony.[9] Accordingly, it is improper for a witness to testify whether another person may or may not have been telling the truth in a specific instance.[10] It is especially problematic when an officer testifies at trial that the defendant is untruthful, because such testimony carries with it the imprimatur of the government that can induce improper reliance by a jury.[11]

[11] However, an officer's statement in the course of a taped interrogation is not "testimony."[12] In *State v. Rocha*,[13] we adopted the rule that statements on veracity by law enforcement officials within a recorded pretrial interrogation played for the jury at trial are neither categorically admissible nor categorically inadmissible and are to be analyzed under the ordinary rules of evidence.[14]

We elaborated that law enforcement statements in a police interview are not admissible to prove the truth of the matter asserted in the commentary but may be independently admissible for the purpose of providing necessary context to a defendant's statements in the interview which are themselves admissible.[15] The police commentary must be probative and material in light of the permissible purpose of providing context to the defendant's responses.[16] Further, interview

---

[9] See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

[10] See *id.*

[11] See, *State v. Rocha, supra* note 9; *State v. Demery*, 144 Wash. 2d 753, 30 P.3d 1278 (2001).

[12] See *id.* See, also, Black's Law Dictionary 1784 (12th ed. 2024).

[13] *State v. Rocha, supra* note 9.

[14] See, also, *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025); *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023); *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020); *State v. Baker*, 298 Neb. 216, 903 N.W.2d 469 (2017).

[15] See *id.*

[16] *Id.*

statements that are otherwise admissible may be excluded as unfairly prejudicial under § 27-403 due to, among other things, the "aura of reliability as a law enforcement officer."[17] Upon request, a defendant is entitled to a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview.

We clarified in *Rocha* that we were not opening a "back door" to allowing the admission of improper opinion testimony by simply labeling it as "context"; trial courts have a serious responsibility to ensure that such statements are relevant for the permissible purpose of providing necessary context to a defendant's statements and that they do not run afoul of § 27-403.[18] A limiting instruction does not "automatically eliminate any risk of unfair prejudice."[19]

We ultimately affirmed in *Rocha* the court's decision to permit, as relevant for context, the introduction of a police interview wherein law enforcement repeatedly and directly questioned the defendant's honesty, including stating, "[Y]ou're not being honest though."[20] In so holding, we noted that the trial court gave a limiting instruction that the statements questioning the defendant's honesty were part of an interview technique and should not be considered substantive evidence or given any weight when considering the truthfulness of the defendant's statements.

In this case, the court, following our mandate in *Rocha*, evaluated the potential probative value of the officer's statements against their potential for unfair prejudice and granted Evans' motion in limine to redact the statements. Nevertheless, one of the statements subject to the court's order was inadvertently

---

[17] *State v. Rocha, supra* note 9, 295 Neb. at 744, 890 N.W.2d at 201.

[18] *Id*. at 741, 890 N.W.2d at 199 (internal quotation marks omitted).

[19] *Id*. at 744, 890 N.W.2d at 201.

[20] *Id.* at 724, 890 N.W.2d at 189 (internal quotation marks omitted).

played for the jury. Evans does not argue prosecutorial misconduct in failing to adhere to the trial court's order.

In the segment of the taped interview at issue, Evans was telling Hinsley that he was being cooperative and Hinsley responded that there was a difference between being cooperative and truthful. In further debate on the issue, Hinsley said, "[Y]ou're not being truthful, though." Before that statement was played for the jury, the court had instructed that the jury should not concern itself with deleted portions of the interview, which were not relevant for the purposes of this trial. The statement was played near the end of the day. The following morning, before the jury heard any more of the video, the court instructed the jury in relevant part that Hinsley's statement were included to give context and were part of interview techniques that "should not be considered as substantive evidence in any way." When the court finished playing for the jury the entirety of the redacted video, it again set forth this admonition. Then, at the close of all the evidence and before submitting the matter for deliberation, the court generally instructed the jury that it should be focused on Evans' statements and not Hinsley's, reiterating that Hinsley's statements were "part of interview techniques and should not be considered as substantive evidence in any way."

[12-15] A mistrial is properly granted in a criminal case where an event occurs during trial of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[21] Where a motion for mistrial is premised on adducing evidence that violates an order in limine, an appellate court will consider that the trial judge was in the best position to assess the potential impact of such evidence on the jury.[22] To prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely showing a possibility of

---

[21] See *State v. Vazquez, supra* note 14.

[22] *Id.*

prejudice.[23] The defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[24] We review rulings on motions for mistrial for an abuse of discretion, and our deferential standard stems in part from the recognition that the trial judge is often better situated than a reviewing court to assess the atmosphere of the trial and the impact of certain evidence or events.[25]

The district court did not abuse its discretion in denying Evans' motion for mistrial. Evans focuses on the alleged inadequacy of the instruction given before the statement was played, which instruction he claims was focused only on use and possession of marijuana. He does not take issue with the wording of the instructions given after the officer's statement was played; instead, he suggests the instructions were insufficient because the jury "had time to think about the statement overnight before coming back the next morning."[26] We disagree with Evans' suggestion that not giving the admonishment until the next morning is decisive of whether Evans was prejudiced. While we have emphasized trial courts' responsibility to ensure that such statements are relevant for the permissible purpose of providing necessary context to a defendant's statements and that they do not run afoul of § 27-403, it is also true that statements during police interrogations are part of common interrogation techniques and not attempts by the officer to convince anyone that the defendant was lying.[27] This fact is not outside of a jury's common understanding, and the court admonished the jury not to consider the officer's statements "as substantive evidence in any way." The court gave this instruction not just once, but three times. Considering the clarity of the court's repeated

---

[23] Id.

[24] Id.

[25] Id.

[26] Brief for appellant at 21.

[27] See, e.g., *Lanham v. Com.*, 171 S.W.3d 14 (Ky. 2005).

admonishment to the jury, we cannot say that the damaging effect of this singular exchange, within the 4½ hours of video, prevented a fair trial.

## 2. Other Acts Objection to Concerns Over Relationship

Evans asserts the court abused its discretion in admitting "other bad acts evidence" through the testimony of Cecilia's friends, coworkers, and relatives that they were concerned about Cecilia's relationship with Evans. Specifically, on appeal, Evans takes issue with the court's admission of Morris', Durand's, Balkus', and Brandy's generalized statements that they were concerned about Cecilia's safety. He also takes issue with (1) N.R.P.'s testimony describing how she asked Evans about her mother's having a black eye and he said it happened when he and Cecilia were "play fighting"; (2) Balkus' testimony that Evans waited in the parking lot when Cecilia was working; (3) Brandy's testimony that Evans was not allowed to be present during Cecilia's supervised visitation with her children; and (4) Wineinger's testimony that Evans was hostile and possessive of Cecilia, would cross boundaries by eating Wineinger's food and staring at her while she slept, and once drove chaotically.

[16] Evans specifically assigns and argues that the court abused its discretion in overruling his objections to these statements under § 27-404(2), on the grounds that it was inextricably intertwined with the charged crimes. We limit our analysis to that argument. Evans does not specifically assign that the court erred by overruling an objection based on the evidence being unfairly prejudicial under § 27-403, or on any other grounds. To be considered by an appellate court, the party asserting an alleged error must both specifically assign and specifically argue the error in the party's initial brief.[28]

An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a

---

[28] *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

defendant's other crimes or bad acts under § 27-404(2), or under the inextricably intertwined exception to the rule.[29] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[30]

Section 27-404(2) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Section 27-404(3) provides:

> When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

[17,18] Under § 27-404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.[31] Though difficult to define, character has been described as the generalized disposition or tendency to act in a particular way in all the varying situations of life, caused by something internal to the actor that arises from that person's moral being.[32] Section 27-404 attempts to prevent juries from convicting because the defendant is a bad person deserving of punishment, rather than because the crime was

---

[29] *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[30] *State v. Cooke*, 311 Neb. 511, 973 N.W.2d 658 (2022).

[31] *State v. Logan, supra* note 5.

[32] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

proved beyond a reasonable doubt.[33] Section 27-404(2) does not apply, however, to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.[34]

As Evans points out, "[t]here was nothing substantive"[35] in the witnesses' general testimony that they had concerns for Cecilia's safety. Indeed, we conclude that this is not testimony of other "crimes, wrongs, or acts" at all.[36] Many courts limit the scope of the "other acts" prohibition to "an activity or conduct" that tends to impugn or reflect adversely upon one's character.[37] Without deciding whether innocuous acts fall outside the purview of § 27-404(2), we agree that there must be "an activity or conduct" for § 27-404(2) to apply. Under the plain language of § 27-404(2), there must be "crimes, wrongs, or acts" by the defendant. The evidence of people's general concerns for Cecilia's safety was not evidence of Evans' activities or conduct.

[19,20] We also note that the substance of the testimony from these witnesses, i.e., that they were concerned about Cecilia's safety as it related to her relationship with Evans, was cumulative of the testimony of Van Sloun and Diaz, which Evans did not object to. Consistent with Neb. Rev. Stat. § 25-1141 (Reissue 2016), an objection must be renewed with each witness in order to preserve for appeal an alleged error as to each witness,[38] with the only possible exception

---

[33] See *id.*

[34] *State v. Logan, supra* note 5.

[35] Brief for appellant at 29.

[36] See § 27-404.

[37] *Klauenberg v. State*, 355 Md. 528, 549, 735 A.2d 1061, 1072 (1999). See, also, e.g., *State v. Kille*, 471 N.J. Super. 633, 274 A.3d 704 (2022); *Gattis v. State*, 637 A.2d 808 (Del. 1994).

[38] See, *State v. Elias*, 314 Neb. 494, 990 N.W.2d 905 (2023); *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), *disapproved on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015). See, also, *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998).

being a standing objection the court has explicitly stated covers multiple witnesses' testimony of the same nature.[39] Furthermore, a continuing objection to a witness' testimony does not preserve the alleged error for testimony by that witness before the objection was made. Though whether an error is harmless must be a fact-specific inquiry in light of the totality of the record,[40] the admission of testimony objected to is ordinarily not prejudicial error when such testimony is substantially identical to testimony admitted without objection.[41] The evidence of people's general concerns for Cecilia's safety was harmless.

We turn next to the activity or conduct reflected in the testimony that Evans once said he was "play fighting" when questioned about giving Cecilia a black eye, waited in the parking lot when Cecilia was working, was not allowed to be present during Cecilia's supervised visitation with her children, once drove chaotically with Cecilia in the vehicle, was hostile and possessive of Cecilia, and would cross "boundar[ies]" by eating Wineinger's food and staring at her while she slept. The district court determined these were inextricably intertwined with the charged crimes and, thus, were not "other" acts. Apart from Evans' actions toward Wineinger, we agree.

[21-23] Other acts are acts "not part of the events giving rise to the present charges,"[42] whereas acts that are inextricably intertwined with the present charges form part of the factual setting of the crime, are so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or are

---

[39] See, *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017); *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011). See, also, *State v. Kalmio*, 846 N.W.2d 752 (N.D. 2014); *Davis v. Com.*, 147 S.W.3d 709 (Ky. 2004); *Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d 897 (Tex. 2004).

[40] See *State v. Torres Aquino*, 318 Neb. 771, 19 N.W.3d 222 (2025).

[41] See *State v. Kirksey, supra* note 38.

[42] *U.S. v. Gorman*, 312 F.3d 1159, 1162 (10th Cir. 2002).

necessary for the prosecution to present a coherent picture of the charged crime.[43] The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of other conduct that forms an integral part of the crime charged is not rendered inadmissible under § 27-404 merely because the acts are criminal in their own right, but have not been charged.[44] The relevancy of inextricably intertwined conduct does not rely on propensity reasoning.[45]

[24] We have held in other cases that prior acts of the defendant toward the victim, which reflected an escalating pattern within the relationship, were inextricably intertwined with the charged crimes where they reflected the defendant's mens rea for the crime. As another court has explained, "In a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent."[46] We agree. Thus, in *State v. Cullen*,[47] we found that evidence of an infant's injuries in the defendant's care, over approximately 7 weeks leading up to the infant's death, was admissible as inextricably intertwined with the charged crime of intentional child abuse resulting in death, because the acts presented a complete picture of the defendant's relationship with the infant and his parents and placed those fatal injuries in the context of an escalating pattern of abuse, shedding light on whether the defendant's actions were intentional or

---

[43] See *State v. White*, 321 Neb. 1, 32 N.W.3d 256 (2026).

[44] *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019).

[45] See 3 Clifford F. Fishman, Jones on Evidence Civil and Criminal § 17:14 (7th ed. 1998). See, also, 1 McCormick on Evidence § 190.9 (Robert M. Mosteller ed., 8th ed. 2020).

[46] *Gattis v. State, supra* note 37, 637 A.2d at 818, citing *Hutchins v. State of Del*., 52 Del. 98, 153 A.2d 204 (1959). See, also, *State v. Smith,* 275 Conn. 205, 881 A.2d 160 (2005); *Abrams v. State*, 331 So. 3d 1184 (Ala. Crim. App. 2021).

[47] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

negligent.[48] We distinguished the facts in *Cullen* from other cases where prior abuse was not considered inextricably intertwined, by pointing out that both the evidence the State sought to introduce and the crime charged involved the same type of offense and the same victim.[49] Similarly, in *State v. Burries*,[50] we held that the evidence of the defendant's assault approximately 17 months before the murder of the victim, with whom he was romantically involved, as well as evidence of prior threats by the defendant toward the victim, were admissible as inextricably intertwined because these acts formed part of the factual setting for the charged crime of first degree murder and showed the defendant acted intentionally or with premeditation.

Likewise, in this case, it was not untenable for the district court to conclude that the evidence of controlling or abusive behavior by Evans toward Cecilia in the months leading up to her death was inextricably intertwined with the charge of first degree murder. The court did not err in admitting the testimony describing Evans' acts toward Cecilia over Evans' § 27-404 objection.

We find, in contrast, that the court abused its discretion by concluding that Evans' behavior toward Wineinger was inextricably intertwined with Cecilia's murder. It is difficult to see how Evans' unpleasant behavior toward Wineinger could be seen as part of his attempt to exert control over Cecilia. Furthermore, the evidence of Evans' behavior toward Wineinger carries the danger of propensity, reasoning that Evans committed the crime because he was a generally unpleasant and creepy person, which is outweighed by any nonpropensity relevancy of these acts to prove the elements of the charged crimes.

---

[48] See *id.*

[49] See *id.*

[50] *State v. Burries, supra* note 39.

[25] But we find the admission of this testimony was harmless error. The inquiry in a harmless error analysis is whether the actual guilty verdict rendered was surely unattributable to the error.[51] Whether error is harmless in a particular case depends upon a host of factors.[52] An appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[53] Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.[54]

The acts described by Wineinger were minor and were eclipsed by the evidence, properly admitted, of broadly similar acts toward Cecilia, as well as the heavy weight of the evidence against Evans, including the evidence that Cecilia was killed in her apartment and taken, in her vehicle, to the location where her body was found and that only Evans had the keys to her vehicle. We also find relevant to our harmless error analysis that during the trial, the court generally admonished the jury that prior acts should not be used to determine Evans' character and that Evans was not on trial for any prior acts. Further, in its final instructions before jury deliberations, the court instructed the jury:

> You may have heard evidence of bad acts about Raymond Evans other than the charges for which he is on trial. You should not consider those acts . . . for purposes of Raymond Evans' character. Raymond Evans is on trial for only the charges that I have instructed you in the beginning of the case.

---

[51] See *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018).

[52] *State v. Torres Aquino, supra* note 40.

[53] *State v. Kidder, supra* note 51.

[54] *Id*.

In light of all these facts, the actual guilty verdicts rendered were surely unattributable to the error of admitting Evans' unusual or rude behavior toward Wineinger.

### 3. Sufficiency of Evidence of Use of Deadly Weapon

Evans contends that the evidence was insufficient to support the jury's verdict that he used a deadly weapon in the commission of the underlying felony. We disagree.

Evans argues there was no evidence of any weapon capable of producing death or serious bodily injury in the manner it was used or intended to be used, pointing out that the State failed to offer into evidence the hammer the State proposed was the deadly weapon and that Linde could not be certain the "sharp-force puncture-type" injuries were specifically caused by a claw-type hammer. To the extent the State suggested a ring was the weapon, Evans argues there was no evidence that the ring could have contributed meaningfully more to Cecilia's bodily injuries than someone's fist.

[26] The Legislature's purpose in creating a separate offense of using a weapon in the commission of a felony was to discourage individuals from carrying deadly weapons while they commit felonies[55] in order to prevent the threat of violence and accompanying danger to human life present whenever one has a deadly weapon within one's immediate control during the commission of a felony.[56] Pursuant to Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2024), "Any person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony." In turn, Neb. Rev. Stat. § 28-109(8) (Reissue 2016) defines a "[d]eadly weapon"

---

[55] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006), *disapproved on other grounds, State v. Rejai*, 320 Neb. 599, 29 N.W.3d 225 (2026).

[56] *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001).

as "any firearm, knife, bludgeon, or other device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or intended to be used is capable of producing death or serious bodily injury." "Serious bodily injury" is "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body."[57]

[27,28] The statutorily enumerated weapons are considered deadly weapons per se, when they satisfy the definitions for those items, whereas whether any "other device, instrument, material, or substance," as stated in § 28-109(8), constitutes a deadly weapon depends on the manner in which it was used or intended to be used.[58] It is up to the State to prove and the trier of fact to decide whether a deadly weapon was used.[59] But Evans erroneously assumes that to be convicted of use of a deadly weapon in violation of § 28-1205, which is not a "firearm, a knife, brass or iron knuckles," the State must prove beyond a reasonable doubt exactly what external device, instrument, material, or substance was used to commit the felony. We agree with other courts[60] that a trier of fact can infer from the nature of the victim's injuries that a deadly weapon was used, without determining the precise identity of the device, instrument, material, or substance.

[29,30] As we have explained, our standard of review directs us to evaluate the evidence that was actually before the fact finder, rather than ponder potentially incriminating facts that were lacking.[61] When a criminal defendant

---

[57] § 28-109(21).

[58] See, *State v. Nguyen*, 293 Neb. 493, 881 N.W.2d 566 (2016); *State v. Pierson*, 239 Neb. 350, 476 N.W.2d 544 (1991).

[59] See *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000).

[60] See, *People v. Alvarez*, 14 Cal. 4th 155, 926 P.2d 365, 58 Cal. Rptr. 2d 385 (1996); *Mixon v. State*, 781 S.W.2d 345 (Tex. App. 1989).

[61] *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024).

challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[62] Circumstantial evidence is evidence of one or more facts from which the existence of the fact in dispute may logically be inferred.[63] Circumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact.[64] Thus, so long as there is sufficient circumstantial evidence that any device, instrument, material, or substance was used to commit a felony, and that such device, instrument, material, or substance was capable of producing death or serious bodily injury in the manner it was used or intended to be used, then there is sufficient evidence to support a conviction for use of a deadly weapon to commit a felony.[65]

There was sufficient evidence in this case to support the jury's verdict that Evans was guilty of use of a deadly weapon to commit a felony. Linde testified that the "patterned injuries," consisting of chains of circular abrasions on Cecilia's body, were from a "rounded-type object." She testified that the "sharp-force . . . injuries," which were clustered on Cecilia's body, were caused by a "sharp object going in." Photographs entered into evidence show the round abrasions and clawlike injuries on various parts of Cecilia's body. Evans does not contest that these were serious bodily injuries.

Linde testified that these injuries suggested a claw-type hammer. Alternatively, the injuries could be from more than one "implement," one round and blunt and the other clawlike. Linde did not suggest the instrument causing these injuries

---

[62] See *State v. Liech*, 320 Neb. 843, 30 N.W.3d 847 (2026).

[63] *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

[64] See, *id.*; *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

[65] See *Mixon v. State, supra* note 60.

could have been a ring worn on the perpetrator's finger or merely someone's fists. Detectives found in the Woodcrest apartment a toolbox containing common household tools, but not a hammer, and detectives could not find a hammer anywhere in the apartment. The State generally argued at trial that a claw-type hammer caused the patterned and sharp-force injuries covering Cecilia's body, and the jury was properly instructed on the definition of a deadly weapon.

Under the evidence presented, the jury could have reasonably inferred that the patterned and sharp-force injuries were caused by a singular claw-type hammer, by a similar instrument, or by two instruments, one round and flat and the other clawlike. Any of those inferences satisfy the essential elements of a "deadly weapon." Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, Evans asserts that his trial counsel was ineffective by failing to investigate and cross-examine witnesses at trial in pursuit of a defense that Jones, not Evans, was the perpetrator. We find that the record is sufficient to determine as a matter of law that trial counsel was not ineffective.

[31-35] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[66] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[67] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill

---

[66] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[67] *State v. Wilson*, 320 Neb. 728, 30 N.W.3d 165 (2026).

in criminal law.[68] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[69] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[70] In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.[71]

[36] An appellate court resolves claims of ineffective assistance of counsel on direct appeal only where the record is sufficient to conclusively determine that trial counsel did or did not provide deficient assistance or the defendant was or was not prejudiced by counsel's alleged deficient performance as matters of law.[72] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record and, thus, an evidentiary hearing.[73] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[74]

Evans points out that, despite knowing Jones was a beneficiary of Cecilia's life insurance policy, the record did not indicate defense counsel had "actually done any investigation into Adam Jones" and "simply relied on cross-examining him."[75] Further, Evans contends he told his defense counsel

---

[68] *Id.*

[69] *Id.*

[70] See *State v. Galindo*, 315 Neb. 1, 994 N.W.2d 562 (2023).

[71] *State v. Vazquez, supra* note 14.

[72] See *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025).

[73] See, *State v. Wilson, supra* note 67; *State v. Kruger, supra* note 72.

[74] *State v. Wilson, supra* note 67.

[75] Brief for appellant at 32.

about recent occurrences of harassment by Jones toward Cecilia, which counsel apparently did not investigate. Finally, Evans points out that defense counsel did not depose Jones before trial and did not cross-examine Jones at trial about the life insurance policy, acts of harassment of Cecilia, or to try to confirm Jones' address to show that Cecilia's phone was near Jones' house at 7 p.m. on Sunday, November 19, 2023. Regarding this last point, Evans points to an exhibit, entered in evidence at trial, which consists of a screenshot of the "Find My iPhone app" showing Cecilia's phone was near an Omaha neighborhood, which was near the location of "AJ."[76] The exhibit also shows that this information was retrieved at 8 a.m. on November 20. Evans concludes that, had these matters been fully investigated, there would have been a reasonable probability the jury's verdicts would have been different. He does not allege what would have been discovered through said investigation.

The trial record shows that defense counsel pursued a defense that Jones murdered Cecilia. Much of the evidence defense counsel attempted to adduce was not permitted by the trial court, and Evans does not raise those rulings as error on appeal. Testimony was adduced at trial that Jones was a beneficiary of a life insurance policy covering Cecilia. And while the record does not reflect what Jones would have testified to or been able to have been impeached on had he been deposed before trial and cross-examined, it does reflect that the detectives investigating the crimes eliminated Jones as a suspect. It would have been reasonable for defense counsel to assume Evans would be unable to obtain admissions from Jones that law enforcement could not.

Furthermore, whatever Jones would have said, the jury had the information from the "Find My iPhone app,"[77] knew Jones' initials, and knew that Jones financially benefited from

---

[76] *Id*. at 34.

[77] *Id*.

Cecilia's death. The jury knew the theory of the defense that Jones, not Evans, was the perpetrator. Indeed, it heard Evans in his police interview espousing this theory. The jury implicitly determined that any theory that Jones was the perpetrator was significantly undermined by the strength of the evidence at trial showing that Evans committed the crimes. In fact, the jury likely surmised that part of Evans' plan to avoid prosecution was to frame Jones for the crimes. The evidence against Evans was substantial. It clearly demonstrated that Cecilia was killed in her apartment, wrapped in sheets and a blanket, carried from the apartment to her Acadia, and taken in the Acadia to Lincoln where her body was dumped. Evans had no explanation for the blood found in the apartment and the evidence of attempts to clean it up. Evans was the only person with keys to the Acadia when it traveled from Cecilia's apartment to the site where her body was dumped and back to the apartment. We conclude that defense counsel's doing more to investigate and present Jones as the perpetrator would not have created a reasonable probability of a different outcome in the trial.

## VI. CONCLUSION

For the foregoing reasons, we affirm.

AFFIRMED.